United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLLEEN MCCULLOUGH,

Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

Case No. 24-cv-03260-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGEMENT AND GRANTING MOTION TO EXCLUDE TESTIMONY OF RON HASSNER**

Re: Dkt. Nos. 74, 77

## I. INTRODUCTION

Plaintiff Colleen McCullough brings this excessive force action against San Francisco Police Department ("SFPD" or the "department"), Sergeant Brendan Caraway, Captain Mark Cota and the City and County of San Francisco ("City") based on events that occurred at a March 2, 2024 pro-Palestine demonstration, when Sergeant Caraway struck McCullough's hand with a baton, causing significant injuries. Presently before the Court are: 1) Defendants' motion for summary judgment seeking dismissal of all of Plaintiff's claims, dkt. no. 74 ("Summary Judgment Motion"); and 2) Plaintiff's motion to exclude the testimony of Defendants' proffered expert Ron E. Hassner on the grounds that the opinions offered by Dr. Hassner do not meet the requirements of Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993), dkt. no. 77 ("*Daubert* Motion"). A hearing on the motions was held on September 30, 2026. For the reasons stated below, Defendants' Summary Judgment Motion is GRANTED in part and DENIED in part. The *Daubert* Motion is GRANTED.[1]

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. SUMMARY JUDGMENT MOTION

### A. Factual Background[2]

#### 1. The March 2, 2024 Protest

On March 2, 2024, Plaintiff attended a protest in San Francisco, California ("the Protest"). Declaration of EmilyRose Johns in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Johns Decl.") ¶ 2 & Ex. A (Deposition of Colleen McCullough ("McCullough Depo.")) at 26: 20-22. At that time, Plaintiff worked as a substitute teacher with the Oakland Unified School District. *Id.* at 19:23-20:16. She is left-handed. *Id.* at 26:14-15. The Protest was planned and was called "Millions March for Palestine." Johns Decl. ¶ 3 & Ex. B (Deposition of Mark Cota ("Cota Depo."), deposition exhibit I (Field Operations Exhibit Event Summary)). Plaintiff testified that she believed the Protest was intended to be a peaceful protest "in solidarity with Palestine." Johns Decl., Ex. A (McCullough Depo.) at 26:25-27:1. Plaintiff attended the Protest to "embody [her] own dissent for the genocide happening in Palestine" and to "hold space for those directly impacted who . . . couldn't do the same." *Id.* at 54:15-22. Previously, Plaintiff had attended a number of other pro-Palestine protests in San Francsico, including one on October 8, 2023 that began in front of the Israeli consulate. *Id.* at 28:11-25; 56:10-21.

In anticipation of the Protest, SFPD Captain Kim had prepared a Field Operations Bureau Event Summary ("Event Summary"), which was approved on February 29, 2024. Johns Decl., Ex. B (Cota Depo.), deposition exhibit I. The Event Summary indicates that SFPD planned for one lieutenant, one sergeant, and fifteen officers to police the Protest, with an additional four sergeants and twenty officers available if called. Johns Decl., Ex. B (Cota Depo.) at 93:7-11, 97:9-98:4, Ex. 1. No barricades or street closures were planned. *Id*. at 93:7-11; 103:24-104:4; 121:19-25, Ex. 1. A Captain's meeting for the Field Operations Bureau was held on Friday, March 1, 2024 at which the upcoming protest was discussed. *Id.* at 106:12-15. Captain Mark Cota attended the meeting because he was scheduled to be the captain on duty that weekend. *Id.* At the

[2] The facts stated herein are undisputed unless otherwise noted.

meeting, Captain Cota expressed his belief that the protest would be large based on a prior pro-Palestine march in the City. Johns Decl., Ex. B (Cota Depo) at 106:8-25; 110:20-111:7. However, the assistant police chief told Captain Cota that SFPD had not "received any information that indicated that" and the Event Summary predicted that there would be only 100 participants. *Id.* at 110:24-111:21. Captain Cota did not make any contingency plans for a march that exceeded 100 participants. *Id.* at 113:12-16.

On March 2, the protesters first convened for speeches at the Harry Bridges Plaza, near the San Francisco Ferry Building and Embarcadero BART station, and then followed a sound truck when the crowd began to move. Johns Decl., Ex. D (Deposition of Rosa Villarroel ("Villarroel Depo.")) at 31:14-32:7; Declaration of Lucia Li in Support of Summary Judgment ("Li Decl."), Ex. A (Cota Depo.) at 246:9-247:8. According to Captain Cota, when he received a report from SFPD Lieutenant Wilhelm that there were 750 people at Harry Bridges Plaza and more arriving on BART, he headed to the plaza to take over as the event commander. *Id.* at 125:24-127:25. Captain Cota testified that an event commander's responsibilities include "making sure the members of his unit [were] in the correct position; monitoring what the crowd [was] doing; [and] monitoring if he [could] get any information about what the crowd may -- or what their intentions may be." *Id.* at 66:12-16.

When Captain Cota arrived at the plaza, he spoke with "a woman in a wheelchair" named Sara, who Lieutenant Wilhelm identified as a contact person, to ask her about the route the protest would take and whether any acts of civil disobedience were planned. *Id.* at 131:1-19. According to Captain Cota, Sara told him she did not know "the exact route" and she would not answer his question about civil disobedience. *Id.* Another witness who participated in the protest testified that she was not aware of any set route for the march. Johns Decl., Ex. D (Villarroel Depo.) at 31:21-22.

As the crowd marched, Captain Cota followed in a patrol car at the tail end of the marchers. Johns Decl., Ex. B (Cota Depo.) at 139:8-24. Also in the car were Lieutenant Wilhelm and Sergeant Reyes. *Id.* Based on his communication with officers at the front of the march, Captain Cota estimated there were approximately 1500 participants at the protest. *Id.* at 246:11-

247:8. When Captain Cota was somewhere on Market Street, Sergeant Reyes proposed that barricades should be erected on Montgomery Street to prevent the protesters from reaching the Israeli consulate, which is located on Montgomery Street between California and Sacramento Streets, and Captain Cota approved that plan. *Id.* at 142-3-18; 145: 6-14; *see also* Li Decl., Ex. C (Caraway Depo.) at 183:22-24 (referring to "barricade lines on Montgomery at Sacramento and California"). Sergeant Reyes then ordered that the barricades be put in place. Johns Decl., Ex. B (Cota Depo.) at 153:15-17.

Captain Cota testified that the "purpose of putting up the barricades" was "for the safety of the Israeli consulate" and "for the safety of protesters[,]" because "prior to having the discussion on the barricades, there was vandalism, graffiti, graffiti indicating violence, indicat[ing] hatred, indicat[ing] to [Captain Cota] that there was also going to be violent vandalism, perhaps an attempt to get into the Israeli consulate by the crowd." *Id.* at 145:16-146:5. Captain Cota remembered seeing broken windows and graffiti with the phrases "Death to Isreal," "Death to Zionism," "SFPD equals KKK," and "something to the sea." Li Decl., Ex. A (Cota Depo.) at 146: 21-25. Captain Cota testified further that his decision to barricade the intersections was based on chants he heard from protesters, including "Death to Israel," "Death to Zionism," and "the sea quote." *Id.* at 249:13-18. However, Captain Cota testified that he had not actually seen any participants in the march commit any acts of vandalism or spray any graffiti. Johns Decl., Ex. B (Cota Depo.) at 148:2-7. Nor had he received "any information from any source that any activity was planned at the Israeli consulate." *Id.* at 161:23-162:1.

In the meantime, Plaintiff had been following the crowd from Harry Bridges Plaza and arrived at the intersection of Montgomery and Sacramento, where the crowd had stopped due to the barricades that had been erected along Sacramento to block off Montgomery Street. Johns Decl., Ex. A (McCullough Depo.) at 57:8-20. She recalls that she stood at the intersection for between fifteen minutes and half an hour while the crowd listened to speeches and engaged in chants led by the sound truck. *Id.* at 64:21-24. Plaintiff testified that at some point she moved towards the barricades when she observed police officers in riot gear who "seemed like they were escalating" and were "pushing the barricades into the protesters." *Id.* at 77:20-78:7. She testified

that her intention was to be a "buffer" between the officers and "old people" and children who were in the crowd. *Id.* She testified further that she felt "really scared that [the officers] were going to escalate and assault the group of protesters, and so . . . [she] put[ ] [her] hands on the barricade to kind of reset that boundary." *Id.*

According to Plaintiff, her hands only "rested" on the barricades, *id.* at 157:19-21; she did not exert any pressure on the barricades. *Id.* at 88:16-18. She testified that she was not attempting to break apart the barricades or cross through them, *id.* at 66:25-67:3, and she did not see any protesters trying to "break apart the barricades" or hear any commands from officers to "get back." *Id.* at 78. Plaintiff further testified that almost immediately upon placing her hands on the barricade she saw Sergeant Brendan Caraway swing his baton overhead with one hand and hit the barricade and then "in milliseconds" he "grabbed the baton with two hands, [swung] it over his head and . . . brought it down with a lot of force[,]" striking her left hand. *Id.* at 68:11-23. Plaintiff testified that the two strikes occurred in such quick succession that she did not have time to remove her hands from the barricade between the first and second strike. *Id.* at 77:13-17. At that point, Plaintiff testified, she removed her hands from the barricades as she felt searing pain and saw that her middle finger and knuckle were "misshapen and crushed" and that her hand was bloody and "horribly disfigured." *Id.* at 88:21-89: 25.

Sergeant Caraway had come to the scene in response to a call for "all day shift units to Code 3, lights and sirens, to that area." Johns Decl., Ex. H (Deposition of Brendan Caraway ("Caraway Depo.")) at 80:14-16. He was wearing his "crowd control helmet" and carrying a 36" baton. *Id.* at 86: 16-18. He learned when he arrived that the Protest was a pro-Palestine protest. *Id.* at 71:17-22. Within a few minutes of his arrival he also learned that SFPD had erected barricades to prevent the protesters from accessing the Israeli consulate. Li Decl., Ex. C (Caraway Depo.) at 90:1-14. He testified that he understood that there was an "ongoing war in Israel and Palestine" and that the protesters were pro-Palestine and thus he "assumed that the SFPD was trying to create a barrier so that one party could exercise their First Amendment right without interacting with the second party." *Id.* at 90:15-91:4. He did not know at that time whether the Israeli consulate was "operational" that day and he had not been informed by SFPD of "any

particular risk or anything [that] was going to happen at the Israeli consulate." *Id.* at 92:3-6.

When Sergeant Caraway arrived, Lieutenant Wilhelm instructed him and his squad to remain at the intersection of Montgomery and California, at the other end of the block on which the Israeli consulate is located, because "more and more people from the [protest] were starting to double back and come around to the California Street side[.]" Johns Decl., Ex. G (Wilhelm Depo.) at 80:21-81:5. Within moments of his arrival, however, Lieutenant Wilhelm observed Sergeant Caraway and his squad "[take] off running" to the Montgomery and Sacramento intersection. *Id.* at 81:8-16. Sergeant Caraway testified that he headed towards Montgomery and Sacramento approximately one minute after he arrived on the scene because he "observed events occurring that needed quick intervention." Johns Decl., Ex. H (Caraway Depo.) at 88:23-89:19. In particular, Sergeant Caraway testified that he saw "a large crowd and they appeared to be breaching the center of the barricade line on [the] northern section" and "very few police officers [were] actively present to resist those people from coming through the barricade." *Id.* at 89:21-25, 92:10-14. He testified that although he could not initially see a "gap" in the barricade, "based on how the officers were responding and how the crowd was responding, "it appeared that [the crowd] had pushed one barricade back . . . [t]owards the police officers." *Id.* at 92:15-23.

According to Sergeant Caraway, as he approached the barricades, he could see a gap but protesters were not coming through the gap because "officers were trying to stop them." *Id.* at 93:15-20. He testified that the officers were "pushing the barricade that was pushed towards us back towards the crowd, and officers were holding the two barricades, trying to get them back together." *Id.* at 93:23-94:1. However, he testified that he had no information that the barricades had ever been physically connected. *Id.* at 94:2-4. Officer Carraway testified that he ran up to the barricade and "used [his] body to collide with the barricade, forcing it back into position with the barricade to the right." *Id.* at 95:25-96:2. According to Sergeant Caraway, he then activated his body camera and began "issuing verbal commands to the crowd" to "get back[,]" which "were not complied with." *Id.* at 97:7-8, 105:22-23; *see also* Johns Decl., Ex. H, Caraway deposition Ex. 5 (Caraway body camera footage). In his subsequent account of what occurred in the Incident Report, Sergeant Caraway noted that it was "extremely loud, and it was difficult to communicate

with other officers." Johns Decl., Ex. H Caraway depo.), deposition ex. 4 (Incident Report) at CCSF-MCCULLOUGH-000016. Sergeant Caraway testified that he did not know if Plaintiff had heard his commands to back up. Johns Decl., Ex. H Caraway depo.) at 142:24-143:3.

Sergeant Caraway explained that he activated his body camera because he "believed . . . the First Amendment activity had jumped from a First Amendment-covered thing to a now crowd control situation in which . . . individuals within the crowd were now showing pre-assault indicators and failing to comply with commands with officers present." *Id.* at 97:13-19. According to Sergeant Caraway, these "pre-assault indicators" included protesters wearing rain jackets and "all types of gloves" and carrying umbrellas. *Id.* at 99:13-15; 103:11-18; *see also id.* at 100:18-101:3 (testifying that the weather that day was "cold[,]" that "once the crowd started to breach the barricade . . . it started to drizzle" and that 10 or 15 minutes later it "started to . . . pour."). He also observed protesters wearing masks and other types of face coverings and "using . . . tools to assault police officers at this time, including a approximately ten-foot long PVC pipe that they were using as a javelin to stab at officers," although this was not captured in the footage of his body camera. *Id.* at 99:15-18, 101:10-21, 105:13-16. But the "main pre-assaultive indicator [was] the attacking of the barricade[,]" according to Sergeant Caraway. *Id.* at 99:19-20.

Sergeant Caraway testified that he struck three protesters with his baton and attempted to strike another individual. *Id.* at 108:4-5; *see also* Johns Decl., Ex. H, Caraway deposition Ex. 5 (Caraway body camera footage). While he was using his baton to strike protesters, Sergeant Caraway announced "force authorized." *Id.* at 147:16-23; 200:2-13. According to Sergeant Caraway, he made this announcement because he "wanted the crowd to know that [the officers] were going to use force to keep [their] barricade in place" and "wanted the officers around [him] to know that [they] could use force to defend the barricade." *Id.* at 47:16-23.[3] Sergeant Caraway concluded that force was justified under the totality of the circumstances because he "knew that if [he] or other officers didn't engage with force, that [they would] lose the barricade and this hostile,

[3] Some body camera footage suggests that some of the other officers at the barricade did *not* use force, however, and were engaged in holding the sections of the barricade together and using zip ties to secure the barricade sections. Johns Decl., Ex. L (CCSF-MCCULLOUGH 0000) at 0:29-45.

volatile situation would get worse." *Id.* at 148:1-6. He testified further that he "knew that if [the officers] lost the barricade, the officers on that line had no other place to go . . . . approximately 1500 people . . . were going to overrun about 20 police officers[.]" *Id.* at 148:7-19. According to Sergeant Caraway, the officers had to "make sure [the barricade] didn't fall" "for the safety of the officers next to us [and] the safety of the people who might be in the Israel[i] consulate." *Id.* He testified that he believed that people in the Israeli consulate might be unsafe because "[c]urrently, there are people killing each other over their differences in this conflict [and] [y]ou ha[d] a crowd or a large crowd that's intent on getting in front of the Israeli consulate." *Id.* at 148:22-25.

He testified that first he struck an unidentified female whose hands were on the barricades and who was not responding to his commands to "get back[,]" "[swinging] for her hand." *Id.* at 108:16-21, 112: 1-2. Next, he struck a male with a camera who later identified himself as media and who was leaning against the barricade as he walked beside it. *Id.* at 112:13-113: 22. Finally, he testified that his "third strike was to a hand that was grasping the top bar of the barricade, and [he] believe[d] that hand was trying to pull the barricade back." *Id.* at 114:20-24. He concluded that the hand was trying to "pull the barricade back" to "open the gap" because "[t]hey had a firm grip on the barricade, and the barricade appeared to be moving with their grab." *Id.* at 115:5-14. He recalled "continuously yelling" "get back" at this time. *Id.* at 115:19-20. Sergeant Caraway then brought the baton down and thought that he had missed the person because he felt "a wood baton strike a metal surface"; he then struck again at what he thought was the same hand and thought he had hit the hand. *Id.* at 115:21-116:15. However, when he reviewed his body camera footage he concluded that the hands belonged to two different people and that he hit the first one (belonging to Plaintiff) but not the second one.[4] *Id.*

At oral argument, the parties agreed that Sergeant Caraway began striking protesters and the barricade within a short time of reaching the barricade and that he struck Plaintiff's hand less than 30 seconds after his strikes began and within only a few seconds of her placing her hands on

[4] The Court makes no finding as to whether Sergeant Caraway's body camera footage is consistent with his testimony.

United States District Court
Northern District of California

the barricade.[5] A moment or two later, a call for a medic to come to the sound truck can be heard in Sergeant Caraway's body camera footage. Johns Decl., Ex. H (Caraway Depo.), deposition exhibit 5 (Caraway body camera footage) at 1:57.

The police log indicates that at 15:00:58, a few minutes after Sergeant Caraway's baton struck Plaintiff's hand, some people in the crowd began to throw plastic water bottles in the direction of the police. Johns Decl., Ex. H (Caraway depo.) at 77:17-23 & Caraway deposition ex. 1 (Event History Detail) at 000086. Approximately two minutes after striking Plaintiff with his baton, Sergeant Caraway's body camera footage captures him tossing a pole and kicking an umbrella that were in his path and then picking up a small Palestinian flag and attempting to rip the flag off its dowel. Johns Decl., Ex. H (Caraway depo.), deposition ex. 5 (Caraway body camera footage) at 3:36-3:51. He testified at his deposition that he was "inspecting" things to see if there were "weapons concealed in them." Johns Decl., Ex. H (Caraway depo.) at 205:18-207:10. At approximately 4:05 p.m., Sergeant Caraway can be heard stating to another officer, "it ends when strong leadership is applied." Johns Decl., Ex. H (Caraway depo.), deposition ex. 5 (Caraway body camera footage) at 9:36-9:37. He continued, "I get a million DPA complaints." *Id.* at 9:45-9:46. A few seconds later, he can be heard to say, "Hey, if they're throwing stuff we're dacking people." *Id.* at 10:02-10:06. According to Plaintiff, "dacking" is a slang term for deploying less lethal munitions. Opposition at 10 (citing Johns Decl., Ex. H (Caraway depo.) at 210:19-211:8).[6] At 4:08 p.m., Sergeant Caraway can be heard in the body camera footage stating. "that's just hateful" as protestors can be heard chanting "free Palestine." Johns Decl., Ex. H (Caraway depo.), deposition ex. 5 (Caraway body camera footage) at 12:40.

Plaintiff testified that after being hit by Sergeant Caraway's baton, she was "nauseous, light-headed and dizzy" and "about to pass out from the pain[,]" and went towards the sound truck seeking help. *Id.* at 90:7-91:4. Eventually, a medical doctor, Dr. Yoongi Tom, who had been participating in the protest, assisted Plaintiff by leading her to a quiet spot where she could sit and

---

[5] The strike on Plaintiff's hand can be seen in Sergeant Caraway's body camera footage sometime between timestamps 22:56:34 and 22:56:58. Plaintiff explains that this time is Zulu time and in order to convert it to Pacific Standard Time 8 hours must be subtracted. Opposition at 7 n. 2.

[6] At oral argument, Defendants stipulated that Plaintiff's definition of this term is correct.

wrapping her hand in gauze. *Id.* at 91: 10-16; *see also* Johns Decl., Ex. C (deposition of Yoongi Tom ("Tom Depo.") at 31:9 -38:24 (describing treatment and examination)). Dr. Tom was assisted by two other healthcare workers who were attending the Protest and who ultimately accompanied Plaintiff to the emergency room in an Uber. Johns Decl., Ex. C (Tom Depo.) at 38:10-24.

Captain Cota testified that when he arrived at the intersection of Sacramento and Montgomery, he saw the crowd "pressing up on the barricades." Li Decl., Ex. A (Cota depo.). at 160:25-161:1. He testified that he saw "dozens" of protesters pushing the barricades into the officers "across the whole barricade line." Cota Dep. 226:9–17. While Sergeant Caraway was using his baton and yelling at protesters to "get back," Captain Cota also was using his baton to strike at protesters. Li Decl., Ex. A (Cota Depo.) at 160:17-19. First he struck a protester he said was engaging in "assaultive behavior" by "trying to separate the barricades." *Id.* at 181:1-9. According to Captain Cota, that person then fell back and another protester took his place, also pushing the barricade toward him, who Captain Cota also struck. *Id.* at 185. Captain Cota testified that he then struck another person who he saw approaching an officer with a closed fist. *Id.* at 188. Captain Cota was not wearing a body camera, as captains are not required to do so. *Id.* at 174-175. Johns Decl., Ex. B (Cota Depo.) at 174:18-22. However, he can be seen in the body camera footage of other officers. Johns Decl., Ex. B (Cota depo.) at 240:7-12. In one video clip, Captain Cota can be seen instructing officers that if the sound truck came through the barricade officers should "not try and stop it" and should "go off to the sides." Johns Decl., Ex. I (CCSF-MCCULLOUGH 0243) at 4:00-4:10.

After the crowd had dispersed,[7] Captain Cota met with the officers, who "looked demoralized" and "worried" about what had occurred, reassuring them that they had done "the right thing." *Id.* at 199:2-200:21. According to Captain Cota, he was not concerned that excessive

[7] It is undisputed that no dispersal order was issued by SFPD. Body camera footage indicates that within a few minutes of the striking of Plaintiff's hand event organizers were announcing from the sound truck that the protest would resume marching and individuals in neon vests who appear to be associated with the protest were ushering protesters away from the barricades. Johns Decl., Ex. I (CCSF-MCCULLOUGH 0243) beginning at 3:40.

United States District Court
Northern District of California

force had been used because he had received no reports from his officers that they had used excessive force during the events that had occurred that day. *Id.* at 207:1-4.

According to Plaintiff, x-rays taken at the emergency room showed that her hand had been broken in more than three places. Johns Decl., Ex. A (McCullough Depo.) at 96:17-21. She underwent hand surgery on March 5, 2024. *Id.* at 97:17.

After the events, a Supervisory Use of Force Evaluation was completed by Sergeant Reyes. Johns Decl., Ex. F (Reyes Depo.), deposition ex. 3 (Supervisory Use of Force Evaluation). The Supervisory Use of Force Report indicates that Sergeant Caraway issued verbal commands but no warnings before the strikes. *Id.* at CCSF-MCCULLOUGH 000206-000207.

**2. Baton Training and Policies**

Defendants' Rule 30(b)(6) witness Justin Bugarin testified that the San Francisco Police Department trains officers on four types of strikes using the 36-inch crowd control baton that was used in this case: (1) two hand horizontal strike with the baton at the rear shoulder, (2) two hand horizontal strike with the baton at the front shoulder, (3) forward thrust, and (4) yawara strike. Johns Decl., Ex. O (Deposition of Justin Bugarin ("Bugarin Depo.")), 100:7-22. He testified that officers are not trained to use a strike "bringing the baton up . . . in a downward strike motion . . . such that the baton goes from being on the shoulder parallel to up perpendicular and then down parallel again in kind of an arc from over the shoulder[.]" *Id.* at 102:20-103:7.

SFPD's use of force policy articulates a number of policy considerations that govern use of force, including "proportionality." Johns Decl., Ex. P (deposition of 30(b)(6) witness Lisa Springer ("Springer depo.)), deposition exhibit 2 (Department General Order 5.01 Use of' Force Policy) ("Use of Force Policy") at CCSF-MCCULLOUGH 000826. In particular, the Use of Force Policy provides:

> When determining the appropriate level of force, officers shall, when feasible, balance the severity of the offense committed and the level of resistance, based on the totality of the circumstances known to or perceived by the officer at the time, with the level of force used and its likely injury outcome.

*Id.*

In September 2021, SFPD's tactical unit issued a policy refresher entitled "Use of Force

Reminder-Barricade-Related Baton Use in Demonstration Situation." Johns Decl., Ex. Q at CCSF-MCCULLOUGH-005507 (Policy Refresher); *see also* Johns Decl., Ex. O (Bugarin depo.) at 42:7-43:3 (testifying that the Policy Refresher was issued in April 2021 as a department-wide email and that there was no monitoring to determine whether the email was opened or read by recipients). The Policy Refresher quotes the Use of' Force Policy, which states that batons may be used "in accordance to Department training to administer strikes to non-vital areas of the body which can subdue an assaultive subject who is actively resisting and poses a threat to the safety of officers or others." *Id.* It also quotes SFPD's 1989 Crowd Control Policy, which permits officers to "use short sharp downward strikes with the baton on the hands of demonstrators" if demonstrators have "rattled" or "kicked" barricades and have continued to engage in the "prohibitive conduct" even after "verbal admonishments and a sharp downward strike to the barricade[.]" *Id.* at MCCULLOUGH-005507-08.

The Policy Refresher goes on to offer a series of "Considerations," including the following:

> All uses of force will be viewed based upon the totality of the circumstances for objective reasonableness. No amount of scenarios could cover all of the possibilities and nuances encountered in the street, your choice to use force is personal to you and whether your inferences were reasonable ones. However, in the above scenario, **the mere touching of a barricade does not meet the standard of "assaultive" and striking the person would violate DGO 5.01**.

*Id.* at CCSF-MCCULLOUGH-005508 (emphasis in original).

Bugarin testified that the Policy Refresher was not issued in response to any directive from the training division but instead, was issued by the tactical unit because "it was the one-year anniversary of the riots from 2020" and "we wanted to just be prepared for it going forward in case there were more planned demonstrations." Johns Decl., Ex. O (Bugarin Depo.) at 43:17-25. He testified further that "all training after [the Policy Refresher was issued] reflected" the Policy Refresher. *Id.* at 42:25-43:1.

### B. Procedural Background

#### 1. The First Amended Complaint

The operative complaint is the First Amended Complaint (FAC), in which Plaintiff

asserted the following claims: 1) excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983 against Sergeant Caraway (Claim One); 2) retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Sergeant Caraway (Claim Two); 3) failure to intervene to prevent use of excessive force under 42 U.S.C. § 1983 against Captain Cota (Claim Three); 4) *Monell* liability under 42 U.S.C. § 1983 for failure to train and supervise Defendant Caraway against Defendant City and County of San Francisco (Claim Four); 5) violation of the Bane Act, Cal. Civ. Code § 52.1, against all defendants (Claim Five); 6) violation of the Ralph Act, Cal. Civ. Code § 51.7, against Sergeant Caraway and Defendant City and County of San Francisco (Claim Six); 7) assault against all defendants (Claim Seven); 8) battery against Sergeant Caraway (Claim Eight); 9) negligent hiring, training and retention, under California Government Code §§ 815.2, 820(a), and 820.8, against Defendant City and County of San Francisco (Claim Nine); and 10) negligence under Cal. Civ. Code § 1714 against all defendants (Claim Ten).

The Court dismissed Claim Nine under Rule 12(b)(6) of the Federal Rules of Civil Procedure and allowed the remaining claims to go forward. *See* dkt. no. 29.

**2. The Summary Judgment Motion**

In their Summary Judgment Motion, Defendants contend all of Plaintiff's claims fail as a matter of law. First, Defendants contend the excessive force claim against Sergeant Caraway (Claim One) should be dismissed because: 1) he committed no constitutional violation; and 2) he did not violate a clearly established right, and therefore he is entitled to qualified immunity. Summary Judgment Motion at 12-16.

As to the first prong of the qualified immunity test, Defendants contend the force used against Plaintiff was objectively reasonable under the totality of the circumstances because "overwhelming governmental interests justified the force[,]" namely, the need to "respond to serious safety threats posed by a 1,500-person strong demonstration attempting to breach the safety perimeter at the Israeli Consulate." *Id.* at 13. According to Defendants, the video evidence and the record as a whole establish that the demonstration was not peaceful. *Id.* at 13-14. They further contend "[t]here were 'safety interest[s] in controlling' a mass of people where, as here, the protesters 'substantially outnumbered' officers, disobeyed commands, 'shouted at the officers,'

and 'engaged the officers in verbal and physical altercations.' " *Id.* at 14 (citing *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018)). Furthermore, they assert, Plaintiff "agrees that it was reasonable to believe that protesters would go into the prohibited area had officers lost the barricade line." *Id.*; *see also* Li Decl., Ex. D (McCullough Depo.) at 79:24-80:10 (testifying that it "seemed very reasonable" that "if the protesters had the opportunity, they would go onto the 400 block of Montgomery Street on March 2nd, 2024[.]").

Defendants also assert that Plaintiff does not dispute that she "had her hands on the uncoupled, moving barricade" and contend Sergeant Caraway reasonably believed that she was "attempting to widen the gap and overtake the safety zone." Summary Judgment Motion at 14. According to Defendants, "Plaintiff's actions were active resistance and an immediate threat to the outnumbered officers, who were attempting to hold the line and who would have been overrun by the large crowd." *Id.* They further contend "the breach of the safety zone threatened the safety of Israel-affiliated persons and property." *Id.* Therefore, "it was objectively reasonable for an officer to use his baton to stop protesters from breaching and overrunning the safety zone[,]" Defendants contend. *Id.*

Defendants also contend that as to the second prong of the qualified immunity test, there was no clearly established law that "prohibit[ed] a baton strike to a hand on a moving police barricade during a large crowd breach against overwhelmed officers, where officers' verbal commands to back up and shows of force failed to gain compliance." *Id.* at 14-15.

Defendants argue that Plaintiff's First Amendment retaliation claim against Sergeant Caraway (Claim Two) also fails because there is no evidence that " 'the protected activity was a substantial or motivating factor in [Sergeant Caraway's] conduct.' " *Id.* at 15 (citing *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)). Instead, Defendants assert, the undisputed facts establish a legitimate, non-retaliatory justification for Sergeant Caraway's use of force. *Id.* Therefore, even though First Amendment activity was occurring, Plaintiff cannot establish that retaliatory animus was the "but-for" cause of Sergeant Caraway's conduct, Defendants assert. *Id.* (citing *Cheairs v. City of Seattle*, 145 F.4th 1233, 1246 (9th Cir. 2025)). Defendants further contend Sergeant Caraway is entitled to qualified immunity

as to the retaliation claim because it was not "clearly established that an officer violates the First Amendment when he uses force against resistive conduct, during an ongoing breach of the safety perimeter during a protest." *Id.* at 18.

Next, Defendants assert that the claim against Captain Cota for failure to intervene (Claim Three) also must be dismissed, both because there was no constitutional violation and because Captain Cota did not violate any clearly established right and therefore, he is entitled to qualified immunity. *Id.* at 19. As to the constitutional violation, Defendants contend an officer may be held liable for failure to intervene only if "they had a 'realistic opportunity' to do so and here, the evidence establishes that Officer Cota did not have such an opportunity because events were evolving rapidly, "second by second by second[,]" and "Captain Cota did not perceive Sergeant Caraway's force." *Id* at 19-20.; *see also* Johns Decl., Ex. B (Cota Depo.) at 227:19-22. Furthermore, Defendants assert that "[c]ontemporaneous video confirms that Captain Cota was facing elsewhere and dealing with the breach in front of him" and that "Plaintiff can offer no evidence to the contrary." *Id.*

Defendants further assert that Plaintiff's *Monell* claim against the City (Claim Four) fails, not only because Plaintiff cannot prove any constitutional violation but also because she "has no evidence of an improper 'longstanding practice or custom[,]' " having failed to offer "evidence of any other unconstitutional incident or one factually similar to the incident here." *Id.* Nor has Plaintiff pled or offered any evidence of failure to train, Defendants contend, and "[t]he evidence is that officers receive robust training on use of force and crowd control." *Id.* Finally, Defendants argue that "Plaintiff also lacks evidence to support a 'ratification' theory" in support of her *Monell* claim. *Id.* at 21.

Defendants assert that the Bane Act claim (Claim Five) fails as to both individual defendants. *Id.* at 22. According to Defendants, " '[t]he elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a specific intent to violate a constitutional right.' " *Id.* at 22 (quoting *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022)). Thus, Plaintiff's Bane Act claims fail for the same reasons her Section 1983 claims fail, Defendants assert, and also because there is no

evidence that any defendant had a "specific intent" to violate Plaintiff's constitutional rights. *Id.* at 22-23.

Defendants argue that the Ralph Act claims against Sergeant Caraway and the City (Claim Six) should also be dismissed. *Id.* at 23-24. According to Defendants, to prevail on the Ralph Act claim against Sergeant Caraway, Plaintiff was required to show that "a substantial motivating reason for his conduct was his perception of [Plaintiff's] political affiliation;" yet there is no evidence he was aware of any political affiliation on Plaintiff's part, Defendants contend. *Id.* Likewise, Defendants assert, "[t]he vicarious liability claim against the City . . . fails" under Cal. Gov't Code § 815.2. *Id.* at 24.

Defendants contend the Assault and Battery claims (Claims Seven and Eight) against Sergeant Caraway fail because his use of force was objectively reasonable. *Id.* at 24-25. They argue that the Assault claim against Captain Cota also fails because "he took no affirmative act against Plaintiff at all." *Id.* at 25. And Defendants assert that both claims fail as to the City to the extent they are based on vicarious liability under Cal. Gov't Code § 815.2. *Id.* at 24-25.

Finally, Defendants argue that because Sergeant Caraway and Captain Cota acted reasonably, their negligence claims (Claim Ten) against those defendants, and against the City based on vicarious liability, fail as a matter of law. *Id.* at 25.

## C. ANALYSIS

### 1. Legal Standards Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**2. Federal Claims Under 42 U.S.C. § 1983**

a. Legal Standards

i. General Legal Standards under Section 1983

Section 1983 provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)). Thus, analysis of a civil rights claim brought under § 1983 begins with the identification of the "specific constitutional right allegedly infringed by the challenged application of force." *Id.* at 394 (citation omitted). The claim is then evaluated under the constitutional standards that apply to that constitutional right. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)).

ii. Legal Standards Governing Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted)). The rule attempts to balance competing interests – those of plaintiffs who have been wronged by government officials, and those of government officials who may be inhibited in performance of their duties out of fear of financial liability and time-consuming litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

To determine if an official is protected by qualified immunity, a court asks (1) whether the plaintiff's constitutional right has been violated; and (2) whether that right was clearly established at the time of the challenged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if such a violation was found should it proceed to the question of whether the violation involved a clearly established right. 533 U.S. at 201. In *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order. 555 U.S. at 236. The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id*. at 237. Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decision making that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201. It is not enough that the general rule is established. *Id*. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Nonetheless, " '[a] right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances.' " *Ballentine v. Tucker*, 28 F.4th 54, 66 (9th Cir. 2022) (quoting *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), abrogated on other grounds by *Nieves v. Bartlett*, 587 U.S. 391 (2019); and citing *Ioane v. Hodges*, 939 F.3d 945, 956 (9th Cir. 2018)). "[T]he question is not whether an earlier case mirrors the specific facts [of the case]. Rather, the relevant question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional." *Id.* (internal citations and quotations omitted).

For purposes of qualified immunity, courts resolve all factual disputes in favor of the party asserting the injury. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013).

b. Excessive Force Claim (Claim One)

i. Legal Standards Governing Excessive Force Claims

A claim against a law enforcement officer for excessive force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "[R]easonableness is judged from the perspective of a reasonable officer on the scene," and "the question [in an excessive force case] is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396-97. "In considering an excessive force claim, [courts] balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations and citation omitted). "The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to 'the type and amount of force inflicted.' " *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)).

In *Graham,*, the Court recognized that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation," 490 U.S. at 397. While these factors are taken into consideration in evaluating objective reasonableness, "[n]ot all errors in perception or judgment . . . are reasonable." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). While courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' . . . nor does the Constitution forgive an officer's every mistake." *Id.* (quoting *Graham*, 490 U.S. at 397; and citing *Maryland v. Garrison*, 480 U.S. 79, 87 n. 11 (1987)).

ii. Whether the Jury Could Find there was a Constitutional Violation

As a preliminary matter, the Court addresses the quantum of force used against Plaintiff to determine the "gravity of the intrusion" on Plaintiff's Fourth Amendment rights. "[B]aton blows are [a] form[ ] of force capable of inflicting significant pain and causing serious injury" and therefore are "regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (citing *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir.2005); *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003)). Here, the evidence is undisputed that Sergeant Caraway struck Plaintiff's hand using a baton that he held with both hands, using full force, and that he caused Plaintiff to sustain serious injury. Therefore, the undisputed facts establish that the intrusion on Plaintiff's Fourth Amendment rights was severe.

Next, the Court must weigh the intrusion on Plaintiff's Fourth Amendment rights against the government's interest in using force. Courts "assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller v. Clark Cnty*., 340 F.3d 959, 964 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396). Courts may also "consider the availability of less intrusive alternatives to the force employed and whether warnings were given." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

Construing the evidence in the light most favorable to Plaintiff, all of these factors could support a jury finding that Sergeant Caraway used unreasonable force. First, there is no evidence in the record that Plaintiff had committed any crime, including any of the acts of vandalism that Captain Cota attributed to the protesters. Therefore, this factor weighs strongly in favor of the conclusion that the force used was unreasonable.

Second, a jury could reasonably conclude that Plaintiff posed no immediate threat to the officers, having simply placed her hands on the barricades for a matter of seconds before Sergeant Caraway struck her hand without making any assessment of who it belonged to. The Court notes that while Defendants cite the fact that the barricade was "uncoupled," Summary Judgment Motion at 14, there is no evidence in the record that the barricade sections, which had been quickly erected, had ever been connected. Further, while Sergeant Caraway testified that he believed Plaintiff was trying to create an opening in the barricade through which protesters would enter, there is evidence in the record from which the jury could conclude that this belief was unreasonable or the testimony was not credible, including evidence that officers were pushing the barricade back towards the protesters, Johns Dec., Ex. A (McCullough Depo.) at 78:2-4 ("my memory is that . . . the police were pushing the barricades into the protesters, into the group of people.") & Ex. H (Caraway Depo.), deposition exhibit 3, dkt. no. 84-9 at ECF pp. 91-93 (Caraway Incident Report) (stating that "[u]pon arrival at the barricade" Sergeant Caraway "ran into the metal barricade forcing the barricade to close and pushing the crowd back"); the fact that no gap appears to be visible near Plaintiff's hand in the video footage at the time of the strike, *see* Johns Decl., Ex. H, deposition exhibit 5 (Caraway body camera footage) at 22:56:37-58; and the undisputed fact that even when gaps appeared in the barricades no protestors went through them. Johns Decl., Ex. H (Caraway depo.) at 93:19-20 (Q: Were people coming through the gap? A: No. The officers were trying to stop them). The video footage also shows individuals on the opposite side of the barricade from the officers who were wearing safety vests and appear to have been associated with the protest blocking protestors from coming up to the barricades or pulling protestors back from the barricades. *See, e.g.* Johns Decl., Ex. H, deposition ex. 5 at 00:34-51.

Third, Defendants' assertion that Plaintiff was "actively resisting" is undercut by the video

footage, which reflects that Sergeant Caraway struck her within seconds of her placing her hands on the barricade, without warning and without giving Plaintiff enough time to comply with commands to get back, which also may not have been audible in a setting that Sergeant Caraway described as "extremely loud." Johns Decl., Ex. H Caraway depo.), deposition ex. 4 (Incident Report) at CCSF-MCCULLOUGH-000016. Even assuming Plaintiff heard his commands to back away and did not immediately comply, "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

Fourth, body camera footage indicates that while Sergeant Caraway and Captain Cota were using their batons to strike protestors, other officers along the barricade were not using force and appear to have been successfully holding the sections of the barricade together and securing it with zip ties, even as Sergeant Caraway was announcing to the officers that force was authorized. A jury could reasonably conclude from this evidence that there were alternatives to the force used by Sergeant Caraway that would have been as effective at maintaining the integrity of the barricade.

Considering these factors together and construing the evidence in the light most favorable to the Plaintiff, the Court concludes that a jury could reasonably find that under the totality of the circumstances, the governmental interest at stake did not justify the force Sergeant Caraway used on Plaintiff and therefore, that her Fourth Amendment rights were violated.

The Court rejects Defendants' reliance on *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) in support of a contrary conclusion. In that case, the officers used baton jabs as to three of the plaintiffs and as to the one plaintiff who alleged a baton strike, the court found that he had been only "brushed" with the baton and that the contact was "incidental to moving and tousling with the crowd." 809 F.3d at 817. In finding that the force used was reasonable, the court emphasized that "[w]hile baton blows are a type of force capable of causing serious injury, . . . jabs with a baton are less intrusive than overhand strikes." *Id.* It further found based on the minor injuries the plaintiffs incurred that the amount of force used was "minimal." *Id.* Given that the use of force here involved a two-handed baton strike that resulted in severe injury, the facts of *Felarca* are not on point and therefore, the finding of reasonableness in that case does not apply

United States District Court
Northern District of California

here.

For these reasons Defendants are not entitled to summary judgment on Claim One based on the reasonableness of the force used against Plaintiff.

iii. Whether the Violation Involved a Clearly Established Right

As discussed above, based on the totality of the circumstances, a jury could reasonably conclude that Plaintiff was, at most, engaged in passive resistance. The Ninth Circuit has found that "[t]he right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established" by 2008. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). Thus, for example, in *Young v. Cnty. of Los Angeles*, the Ninth Circuit found that the district court had erred in granting summary judgment in favor of the defendant on an excessive force claim where the officer struck the plaintiff with his baton and sprayed him with pepper spray when the plaintiff had refused to get back into the car during a traffic stop in response to the officer's command, instead sitting on the curb and eating broccoli. 655 F.3d 1156, 1166 (9th Cir. 2011). The court went on to conclude that the officer was not entitled to qualified immunity because well-established law put the officer on notice that "the force used was excessive—that to pepper spray an individual and strike him with a baton for disobeying a traffic officer's order to get back in his car (and sitting instead on the curb eating his broccoli) constituted a violation of the Fourth Amendment." *Id.* at 1168.

Similarly, in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), the court found that the officers violated the plaintiff's constitutional right by deploying pepperball projectiles at demonstrators, one of which hit the plaintiff in the eye and caused permanent injury, to disperse a crowd of 1,000 to get them to comply with a dispersal order. 685 F.3d at 872, 833. The court found that "[a]lthough the officers encountered individuals at various points during their sweeps who threw bottles or other debris at them, or haphazardly threw such items throughout the complex, the defendants admit that they never saw [the plaintiff] throw anything—in their direction or in any other direction." *Id.* at 880. The court noted that "the general disorder [at the scene] [could not] be used to legitimize the use of pepperball projectiles against non-threatening individuals." *Id.* at 881. It went on to affirm the district court's conclusion that the officer was

not entitled to qualified immunity, explaining that while "the pepperball projectile is a relatively new mechanism by which a combination of concussive impact and chemical irritants can be applied to individuals by law enforcement, the type of pain inflicted is the same or greater than that caused by weapons that this court has already recognized constitute excessive force when applied individually under similar circumstances." *Id.* at 884.

Here, a jury could reasonably conclude that Plaintiff had committed no crime, did not hear Sergeant Caraway's commands to back up or did not have time to respond to them, or at most passively resisted those commands for a matter of seconds, and posed no immediate threat to the officers, even taking into account the chaotic circumstance under which the use of force occurred. *See Sabbe v. Washington Cnty. Bd. of Commissioners,* 84 F.4th 807, 824 (9th Cir. 2023) (holding that insufficient efforts to communicate with decedent prior to use of force pointed to conclusion that degree of force used was excessive, and noting that in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) the court held that "failure to give sufficiently audible warnings that force would be used weighed against a finding of reasonableness."). The Court concludes that it is well-established that an intermediate use of force – and specifically, a baton strike using two hands and swinging with full force – under such circumstances is unconstitutional in light of the case authority discussed above.[8]

---

[8] At oral argument, Defendants pointed to *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024) in support of their assertion that Sergeant Caraway's use of force was reasonable and that he is entitled to qualified immunity as to Plaintiff's Fourth Amendment claim. In that case, the Ninth Circuit held that an officer acted reasonably when he used intermediate force (firing a muzzle blast at close range) against a photographer who had approached a police skirmish line as it was advancing on protesters, had taken photos, and then "turned and began to slowly walk away from the police line." 123 F.4th at 1059. The facts of that case are distinguishable from the facts here in several respects. First, while the court found that the force used in that case was intermediate, it emphasized that the plaintiff's "actual injuries were nowhere near as serious as those in *Nelson*[.]" *Id.* In particular, the plaintiff was "left with a burning sensation in her eyes for roughly fifteen minutes, a temporary cough, and bruising on her backside that caused her to miss a day of work." Here, as in *Nelson*, Plaintiff's injury was much more severe. Perhaps more importantly, the circumstances were quite different in *Puente* as the police had "made several attempts to disperse the crowd[,]" had "announced an unlawful assembly from a helicopter above" the protesters and then had "repeatedly communicated further unlawful assembly announcements" from a police vehicle adjacent to the protesters. *Id.* When some protesters failed to disperse, the police formed a skirmish line and moved down the street towards the protesters "using pepper balls to disperse the remaining individuals, particularly those that [the police] officers perceived as aggressive." *Id.* It was in this context that the plaintiff "moved toward the skirmish line[,] even after officers had begun deploying chemical spray at the crowd in her immediate vicinity[,]" "in clear disregard of

United States District Court
Northern District of California

The Court further finds that Sergeant Caraway was on notice that such conduct violated the Fourth Amendment based on SFPD's own Policy Refresher, which explicitly states that merely touching a police barricade does not constitute "assaultive behavior" and therefore, use of a baton strike would constitute excessive force in that scenario. Johns Decl., Ex. O (Policy Refresher) at CCSF-MCCULLOUGH-005508; *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (finding that constitutional right was well-established based, in part, on the fact that the police department's own training materials recognized that the type of force used in that case could cause asphyxia or death). Accordingly, the Court concludes that Sergeant Caraway is not entitled to qualified immunity as to Plaintiff's excessive force claim.

c. Retaliation Claim (Claim Two)

i. Whether the Jury Could Find there was a Constitutional Violation

To prevail on her First Amendment retaliation claim against Sergeant Caraway, Plaintiff must establish that "(1) [she] engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—*i.e.*, that there was a nexus between the defendant's actions and an intent to chill speech." *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (citation omitted). A successful First Amendment retaliation claim requires that the retaliatory animus be the " 'but-for' cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Defendants seek summary judgment based on the third factor, arguing there is no evidence Plaintiff's protected activity was a substantial motivating factor in Sergeant Caraway's conduct. The Court disagrees.

---

the repeated announcement that an unlawful assembly had been declared and after multiple orders to disperse had been issued." *Id.* In contrast, here it is undisputed that *no* dispersal orders had been given at the time that Sergeant Caraway hit Plaintiff's hand. Moreover, there is evidence from which a jury could conclude that Sergeant Caraway's commands were not audible and/or that he acted so quickly that Plaintiff did not have time to comply with his commands even if she heard them. Therefore, *Puente* is not on point.

"If a factfinder concludes that there was no legitimate justification for [the officer's] actions, they could reasonably infer that those actions were motivated by retaliatory animus." *Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir. 2024). But even if a "legitimate motive" exists, "there could still be a viable retaliation claim" if the defendant would not have taken the action but for the retaliatory animus. *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019). The question of whether an officer's conduct was motivated by retaliatory animus involves questions of fact that normally should be left for trial. *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). Here, Defendants contend the undisputed record establishes a legitimate, non-retaliatory justification for Sergeant Caraway's use of force and therefore, that he could not have been motivated by retaliatory animus. In particular, they point to the undisputed fact that Sergeant Caraway did not hear or see Plaintiff engaging in any political speech; indeed, Defendants assert, "Plaintiff was *not* expressing political speech when she had her hand on the barricade." Summary Judgment Motion at 17.

Yet the undisputed evidence establishes that Sergeant Caraway knew that the protest was a pro-Palestine protest when he struck Plaintiff with his baton -- without looking to see who the hand belonged to or make any further assessment of whether Plaintiff was engaged in active resistance or assaultive conduct -- and thus, a reasonable inference can be drawn that he attributed pro-Palestine beliefs to Plaintiff based on her participation in the protest and was motivated by retaliatory animus. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't,* 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020)("The use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that SPD's actions were substantially motivated by Plaintiffs' protected First Amendment activity."). The close proximity in time between Plaintiff placing her hands on the barricade and Sergeant Caraway's use of force against Plaintiff may also support an inference of retaliatory animus. *Llera v. Las Vegas Metro. Police Dep't*, No. 220CV01589RFBBNW, 2023 WL 6393092, at *6 (D. Nev. Sept. 30, 2023) (finding that the "short proximity in time between Decedent's conduct and Defendant Squeo's retaliatory conduct supports an inference that Defendant Squeo retaliated against Decedent in violation of his First Amendment rights.") (citations omitted).

Furthermore, as discussed above, there is evidence in the record from which a jury could reasonably conclude that there was *not* a legitimate justification for the degree of force Sergeant Caraway used, drawing all reasonable inferences in favor of Plaintiff. In addition, there is evidence in the video footage which a jury could find reflected retaliatory animus, including Sergeant Caraway's apparent negative reaction to the "free Palestine" chant ("that's just hateful") and the small Palestinian flag he picked up and then threw down after attempting to rip the flag from its dowel. While Defendants contend Plaintiff's reliance on the "hateful" comment is "without context and reveal[s] no animus toward the pro-Palestine viewpoint," Reply at 8-9, a jury could reasonably conclude based on the footage that Sergeant Caraway was, in fact, reacting to the core message of the protesters (including Plaintiff). Based on this evidence, the Court cannot find as a matter of law that Sergeant Caraway was not substantially motivated by a desire to punish Plaintiff for expressing her support Palestine by participating in the protest. Rather, this is a question better decided by the jury. *See Ballentine v. Tucker*, 28 F.4th 54, 63 (9th Cir. 2022) ("[t]he possibility that other inferences could be drawn [regarding the officers' motivations] that would provide an alternate explanation for the [officers'] actions does not entitle them to summary judgment. . . . This issue is for the trier of fact, not for us, to resolve.") (internal quotations and citations omitted).

Defendants' reliance on *Cheairs v. City of Seattle*, 145 F.4th 1233 (9th Cir. 2025), in support of a contrary result is misplaced. In that case, the plaintiff was hit with a blast ball while he was filming a protest and he alleged that the officers had fired at him to retaliate against him for *filming* the protest rather than for participating in it. 145 F.3d at 1246-47. The plaintiff testified that he was not a participant in the protest and had gone to observe the interactions between police and protesters only out of curiosity. *Id.* at 1238. The plaintiff's retaliation claim failed, however, because the undisputed evidence established that the officer who shot the blast ball was not aware that the plaintiff was filming and could not even see him when he fired because his view of the plaintiff was obstructed by another line of officers; and the plaintiff conceded in his deposition that "he had no reason to believe that [the officer] intended to hit him with a blast ball as he stood filming the protest." *Id.* at 1246. Based on these undisputed facts, the plaintiff could not prevail

on his theory of retaliation. Here, in contrast, Plaintiff 's theory or retaliation was based on her First Amendment right to express support for Palestine by attending a pro-Palestine demonstration. Whether Sergeant Caraway's use of force against her was motivated by a desire to punish her, as a protest participant, for exercising her First Amendment right, is a question for the jury to decide.

ii. Whether the Violation Involved a Clearly Established Right

"The right to be free from First Amendment retaliation cannot be framed as 'the general right to be free from retaliation for one's speech.'" *Rile's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 729 (9th Cir. 2022) (quoting *Reichle v. Howards*, 566 U.S. 658, 665 (2012)). "Rather, the right must be defined at a more specific level tied to the factual and legal context of a given case." *Id.* Nonetheless, as discussed above, a plaintiff need not point to a case involving identical facts to defeat qualified immunity; rather, "the relevant question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional." *Ballentine v. Tucker*, 28 F.4th 54, 66 (9th Cir. 2022).

As a preliminary matter, the Court must define the right at issue at the appropriate level of specificity. Plaintiff contends the specific inquiry here is whether "a plaintiff had the right to be free from retaliatory use of excessive force even if an arrest was supported by probable cause." Opposition at 22. Defendants, on the other hand, assert that "[t]he proper inquiry here is whether it was clearly established that an officer violates the First Amendment when he uses force against resistive conduct, during an ongoing breach of the safety perimeter during a protest." Summary Judgment Motion at 18. The Court does not find either side's framing of the issue to be entirely correct.

First, as Plaintiff does not assert a claim for wrongful arrest under the Fourth Amendment, her focus on whether retaliatory use of force is permissible even where there is probable cause for arrest does not capture the specific facts at issue here. On the other hand, Defendants' framing of the question incorporates a number of factual findings based on inferences that they have drawn in their own favor rather than Plaintiff's, such as the finding that Plaintiff was engaging in "resistive" conduct and that there was an "ongoing breach of the safety perimeter." But in considering

qualified immunity, the Court must draw all reasonable inferences in favor of the non-moving party. The Court finds that the relevant question is whether a reasonable officer would be on notice that it was unconstitutional to use intermediate force against a peaceful protester who placed her hands on a barricade without first giving audible commands to move away from a barricade and sufficient time to comply with those commands in order in order to punish her for engaging in protected speech, even in the context of a protest where some protesters may have been attempting to move the barricade.

Plaintiff has cited three cases to show that the First Amendment right to be free from retaliatory excessive force was well-established. Opposition at 22. None of them addresses closely analogous facts. In *Ballentine v. Tucker*, the plaintiffs had been arrested for chalking the sidewalks under Nevada's anti-graffiti statute after chalking anti-police messages on the sidewalk on several occasions, which were documented by the arresting officer. 28 F.4th 54, 60 (9th Cir. 2022). Although there was probable cause to arrest the plaintiffs, the plaintiffs pointed to "evidence showing that they were arrested while others who chalked and did not engage in anti-police speech were not arrested." *Id.* at 62. This evidence of differential treatment was enough to place the case within the ambit of an exception to the general rule that a plaintiff who brings a First Amendment retaliatory arrest claim must establish that there was no probable cause for arrest. *Id.* (citing *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019)). The court further found that the right to be free from retaliatory arrest even where there was probable cause to arrest under these circumstances was well-established, pointing to Ninth Circuit cases that predated *Nieves* that "gave fair notice that it would be unlawful to arrest Plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of probable cause." *Id.* at 65. The circumstances here, however, do not involve alleged differential treatment of Plaintiff as compared to other similarly situated individuals with respect to Sergeant Caraway's use of force.

In *Duran v. City of Douglas, Ariz.*, the defendant officer had conducted a traffic stop after the plaintiff made obscene gestures and yelled obscenities while riding as a passenger in the car. 904 F.2d 1372, 1374 (9th Cir. 1990). The officer arrested the plaintiff for disorderly conduct and a tussle ensued, resulting in injury to the plaintiff. *Id.* at 1375. The court found that to the extent

United States District Court
Northern District of California

the officer lacked "a reasonable belief that criminal or otherwise dangerous activity [was] afoot" and stopped the plaintiff for "making obscene gestures toward him and yelling profanities in Spanish while traveling along a rural Arizona highway[,]" this would be a violation of the First Amendment. *Id.* at 1378. As there were factual disputes as to whether the officer detained the plaintiff to punish him for his protected speech, the court found that summary judgment on this claim was not proper. *Id.* It went on to conclude that the officer was not entitled to qualified immunity because "the rights here in question were so clearly established that [the officer] should have known he was acting illegally when he initiated the traffic stop." *Id.* The court explained, "[i]f there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air. No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property." *Id.* The court continued, "[n]o less well established is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Id.*

In *Lopez v. City of Glendora*, an unpublished decision, the court affirmed denial of qualified immunity where the plaintiff alleged she was stopped based on her race and that she was then subjected to retaliatory excessive force when she asked for a female officer to conduct a pat-down. 811 F. App'x 1016 (9th Cir. 2020). The court found that "[a] jury could reasonably conclude that [the officer's] excessive use of force was retaliatory because it immediately followed [the plaintiff's] request for a female officer to pat her down and she was, at most, passively resisting at the time." *Id.* (citing *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1022–23 (9th Cir. 2015); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)). The court further concluded that "[t]hese cases condemning 'any action to punish or deter' a suspect's speech were clearly established law at the time of the incident." *Id.* (quoting *Duran*, 904 F.2d at 1378).

While none of these cases involved use of excessive force in the context of a protest where the force was used as a crowd control measure to protect the integrity of a barricade, the Court

concludes that the state of the law would have put Sergeant Caraway on notice that using intermediate force under the circumstances here (drawing all reasonable inferences in Plaintiff's favor) was unconstitutional. First, it is well-established that the right of protesters to express their political views is a core First Amendment right and that that right is violated where actions by government officials "deter[ ]ed or chill[ ] [the plaintiff's] political speech and such deterrence [is] a substantial or motivating factor in [the defendant's] conduct." *Mendocino Env't Ctr. v. Mendocino Cnty*., 192 F.3d 1283, 1300 (9th Cir. 1999); *see also Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment. . . . It has been clearly established since time immemorial that city streets and sidewalks are public fora.").

It is also well-established that a government official may not punish individuals for engaging in protected speech based on the official's hostility towards the content of that speech. *See, e.g., Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990 ("the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives" is well-established). Whether or not Sergeant Caraway was "aware of the fine points of First Amendment law," *see id.*, to the extent he is found to have used more force than was necessary to accomplish any legitimate law enforcement objective with the intent of punishing Plaintiff for the pro-Palestine views she and other protesters were expressing, well-established law put him on notice that such conduct violated her constitutional rights. Therefore, the Court finds that Plaintiff is not entitled to qualified immunity as to the retaliation claim.

d. Failure to Intervene (Claim Three)

" '[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen.'" *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), as amended (Oct. 31, 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996)). "[H]owever, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.*: *see also Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1159 (N.D. Cal. 2009), amended in part, No. C-05-02935 MEJ, 2009 WL 10736653 (N.D. Cal. Sept. 8, 2009) ("if a violation happens so quickly

that an officer had no 'realistic opportunity' to intercede, then the officer is not liable for failing to intercede") (quoting *Cunningham*, 229 F.3d at 1289–90). Apart from that exception, "[i]f an officer fails to intercede, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who performed the offending action." *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir. 2021) (internal quotation and citation omitted).

Here it is undisputed that Captain Cota was in close proximity to Sergeant Caraway at the time of the latter's use of force against Plaintiff. Further, while Defendants contend Captain Cota was unaware of Sergeant Caraway's actions because his back was to Sergeant Caraway at that time, the body camera footage is too jerky and disjointed for the Court to confirm this assertion. Nonetheless, Sergeant Caraway's body camera footage reflects that he struck Plaintiff under a minute after he had begun striking the barricade and protesters – and within seconds of Plaintiff placing her hands on the barricade. Under these circumstances, the Court concludes, as a matter of law, that Captain Cota did not have a reasonable opportunity to intervene to prevent Sergeant Caraway's use of force against Plaintiff even assuming that he was aware of Sergeant Caraway's use of force against her. Therefore, the Court concludes that Defendants are entitled to summary judgment on this claim.

e. *Monell* Claim (Claim Four)

i. Legal Standards

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. To impose liability on a local governmental entity under *Monell*, "a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.' " *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389–91 (1989)).

"[W]here a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio*, 489 U.S. at 389. The same standard applies to *Monell* claims based on inadequate supervision. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). Alternatively, municipal liability is established where "the plaintiff . . . prove[s] that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

ii. Discussion

Plaintiff asserts her *Monell* claim based on the theory that the City failed to train and supervise Sergeant Caraway and then ratified his use of excessive force. Opposition at 23-24. The ratification theory clearly falls short as Plaintiff has made no meaningful attempt in the briefing to show that any individual with final policy-making authority specifically ratified Sergeant Caraway's use of force against Plaintiff. In particular, while Plaintiff points to evidence that Captain Cota reassured officers that they would not face discipline for the force that had been used, she does not point to evidence that Captain Cota had final policy-making authority or that he was aware of Sergeant Caraway's use of force against Plaintiff. She also points to evidence that "days after video surfaced depicting Caraway's unreported use of force, he got a call from his union representative reassuring him that he would not face repercussions." *Id.* at 23; *see also* Johns Decl., Ex. H (Caraway depo.) at 17:15-18:18 (testifying that the Department and the Union determined his unreported use of force was justified and within policy.). But this hearsay within hearsay is inadmissible and Plaintiff has not offered any admissible evidence as to who in the Department might have made a finding that the use of force was justified or whether they had final policy-making authority.

As to Plaintiff's failure to train and supervise theory, Plaintiff has not identified any other similar incidents to establish the existence of an unconstitutional policy or custom with respect to training in the use of a baton in a crowd control situation. *See Gordon v. Cnty. of Orange*, 6 F.4th

961, 974 (9th Cir. 2021) (no evidence of a policy or custom where there was only a single incident). Instead, Plaintiff relies on the issuance of the Policy Refresher as evidence that the Department had "identified an infirmity in their training" with respect to baton use at protests. Opposition at 23. Issuance of a "refresher" in anticipation of possible protests is a far cry from an acknowledgment of inadequate training and certainly would not provide a sufficient basis for a jury to conclude that any shortcoming in the Department's training rose to the level of deliberate indifference. Therefore, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's *Monell* claim.

**3. State Law Claims**

a. Bane Act Claim (Claim Five)

The Bane Act " 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by "threats, intimidation, or coercion." ' " *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1)). In *Cornell v. City and County of San Francisco*, the California Court of Appeal "recognized that Bane Act claims are routinely alleged in Section 1983 claims under federal pendent jurisdiction and that '[t]he Bane Act's requirement that interference with rights must be accomplished by threats[,] intimidation or coercion "has been the source of much debate and confusion." ' " *Id.* (quoting 17 Cal. App.5th 766, 801(2017) (citations omitted)). The *Cornell* court provided guidance on this question, which the Ninth Circuit has found is binding on federal courts. *Id.* at 1043. In *Reese*, the court drew two conclusions as to the necessary showing for an excessive force claim under the Bane Act:

> First, the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be transactionally independent from the constitutional violation alleged. *Cornell,* 225 Cal.Rptr.3d at 382–83. Second, the Bane Act requires a "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id*. at 384.

*Id.* at 1043. Thus, to prevail on a Bane Act claim, a plaintiff must establish "that the defendants intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotations and citations omitted).

As discussed above, the Court finds that there are fact questions as to whether Sergeant

Caraway used excessive force and retaliated against Plaintiff for exercising her First Amendment rights, in violation of clearly established rights. This evidence is also sufficient to defeat summary judgment as to Plaintiff's Bane Act claim against Sergeant Caraway. On the other hand, for the same reasons the Court finds that the failure to intervene claim against Captain Cota fails, the Bane Act claim against Captain Cota also fails. Because there are factual disputes as to the Bane Act claim against Sergeant Caraway, the associated vicarious liability claim asserted under Cal. Gov't Code § 815.2 against the City based on Sergeant Caraway's conduct (but not Captain Cota's conduct) also survives summary judgment.

b. Ralph Act Claim (Claim Six)

The Ralph Act provides, in relevant part, that "[a]ll persons within the jurisdiction of [California] have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation." Cal. Civ. Code § 51.7 (b)(1). To prevail on a Ralph Act claim, a plaintiffs must establish four elements: "(1) Defendants committed or threatened violent acts against Plaintiffs; (2) Defendants were motivated by their perception of Plaintiffs' political affiliation; (3) Plaintiffs were harmed; and (4) Defendants' conduct was a substantial factor in causing Plaintiffs harm." *Campbell v. Feld Ent., Inc*., 75 F. Supp. 3d 1193, 1205 (N.D. Cal. 2014) (citing *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1167 (N.D. Cal. 2009) (citing *Austin B. v. Escondido Union Sch. Dist*., 149 Cal.App.4th 860, 880–81 (2007))). The test for a violation of the Ralph Act is whether "a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendant and have perceived a threat of violence." *Winarto v. Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1289–90 (9th Cir. 2001). Further, the Ralph Act's political affiliation requirement is interpreted "very broadly." *Campbell*, 75 F. Supp. 3d at 1210

Defendants seek summary judgment on this claim on the ground that there is "no evidence that Sergeant Caraway's perception of Plaintiff's political affiliation was a substantial motivating reason for the force." Motion at 24. Because the claim against Sergeant Caraway fails, they contend, the vicarious liability claim against the City fails as well. *Id.* As discussed above, however, the Court finds that there are material disputes of fact as to whether Sergeant Caraway's

use of force against Plaintiff was motivated by her political affiliation with pro-Palestine protesters. Therefore, the Court finds that this claim survives summary judgment as to both Sergeant Caraway and the City.

c. Assault Claim (Claim Seven)

Plaintiff asserts her assault claim against Sergeant Caraway, Captain Cota and the City (based on vicarious liability). Defendants contend the claim fails as to Sergeant Caraway because his use of force was objectively reasonable and that the claim fails as to Captain Cota because he took no affirmative action against Plaintiff at all. Likewise, they assert that the claims against the City based on vicarious liability fail because neither of the individual defendants can be held liable for assault.

"Under California law, to prevail on the tort of assault, the plaintiff must establish that: (1) the defendant threatened to touch the plaintiff in a harmful or offensive manner; (2) it reasonably appeared to the plaintiff that the defendant was about to carry out the threat; (3) the plaintiff did not consent to the defendant's conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012). However, a peace officer may threaten to use force so long as the force is not unreasonable. *See Isom v. United States*, No. 23-CV-103-DMS-MMP, 2024 WL 4370781, at *3 (S.D. Cal. Oct. 1, 2024) (applying California law and finding that admission that officer acted reasonably foreclosed assault claim).

Because the Court finds that there is a material issue of fact regarding whether Sergeant Caraway's use of force was reasonable, it also concludes that the assault claim against him survives summary judgment. Plaintiff does not meaningfully respond to Defendants' challenge to the assault claim against Captain Cota, however. Furthermore, Plaintiff has not pointed to any evidence that Captain Cota ever threatened her or that she was even aware of his presence at the barricade. Nor has she cited any authority suggesting that any *inaction* on Captain Cota's part would be sufficient to establish an assault against her by Captain Cota.[9] Therefore, the Court

[9] In her Opposition, Plaintiff asserts "[w]hile true that where there is excessive force under the Fourth Amendment, there is battery, assault and negligence, the state law torts are more expansive

United States District Court
Northern District of California

concludes that Defendants are entitled to summary judgment as to the assault claim against Captain Cota. Likewise, while the vicarious liability claim against the City survives as to Sergeant Caraway's actions, the claim fails as to Captain Cota's conduct.

d. Battery Claim (Claim Eight)

Plaintiff asserts a battery claim against Sergeant Caraway and seeks to hold the City vicariously liable as well.

"To prevail on a claim of battery under California law, a plaintiff must establish that: (1) the defendant touched the plaintiff or caused the plaintiff to be touched with the intent to harm or offend the plaintiff; (2) the plaintiff did not consent to the touching; (3) the plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's situation would have been offended by the touching." *Avina*, 681 F.3d at 1130–31. Where the defendant is a police officer, the plaintiff must "prove unreasonable force as an element of the tort." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998); *see also Brown v. Ransweiler,* 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable.")

Defendants assert that the battery claim fails as to both Sergeant Caraway and the City because Sergeant Caraway's use of force was reasonable as a matter of law. As explained above, however, the Court finds that there are factual disputes as to whether Sergeant Caraway's use of force was reasonable. Therefore, Plaintiff's battery claim against both Sergeant Caraway and the City survives summary judgment.

e. Negligence (Claim Ten)

Plaintiff asserts her negligence claim against Sergeant Caraway and Captain Cota and seeks to hold the City vicariously liable for their conduct. Defendants contend these claims must

---

and allow the Court to consider pre-force conduct, including actions that police took to create the danger that they then use force to respond to, in its analysis." Opposition at 25-26 (citing *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1128 (9th Cir. 2021); *Rodriguez v. Cnty. of Los Angeles*, 654 F. Supp. 3d 1029, 1051–52 (C.D. Cal. 2023)). The cases Plaintiff cites, however, support her assertion only with respect to negligence; neither addresses assault or battery. Thus, to the extent this argument is intended to address Defendants' challenge to the assault claim against Captain Cota, it is not persuasive.

be dismissed because both officers acted reasonably under the Fourth Amendment, which establishes that they used reasonable care for the purposes of her negligence claim. Because the Court finds that there are fact questions as to the reasonableness of Sergeant Caraway's conduct, the negligence claim against him survives summary judgment, as does the claim against the City based on that conduct.

On the other hand, the Court finds that the negligence claim against Captain Cota fails as a matter of law even though, as Plaintiff points out in her Opposition, "California negligence law overall is broader than federal Fourth Amendment law in excessive force cases." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1128 (9th Cir. 2021) (holding that the district court had erred in granting summary judgment as to an officer who had used deadly force against the plaintiff by improperly "conflat[ing] Fourth Amendment excessive force standards with California negligence law."); *see also Rodriguez v. County of Los Angeles*, 654 F. Supp. 3d 1029, 1051–52 (C.D. Cal. 2023) (noting that state negligence law is "broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used[,]" and further observing that "[t]his means that juries can consider the tactical conduct and decisions just before the use of force when evaluating a negligence claim[.]").

Plaintiff suggests that under state negligence law, "to impede the march and close down the street without justification, to withhold information from the demonstrators about how and where to reroute the march, and to use force without warning or a dispersal order all inform the finding of assault, battery and negligence." Opposition at 26. However, she does not explain how the two cases she cites, both of which focus on the conduct of the individual who is accused of actually using excessive force, albeit, over a wider time frame than is typically considered in conducting an excessive force analysis under the Fourth Amendment, support the conclusion that Captain Cota can be held liable for negligence based on his safety and crowd-control decisions.[10]

Because Plaintiff has failed to identify facts from which a jury could reasonably find

[10] Defendants also assert in their reply brief that Captain Cota is statutorily immune from liability based on his discretionary decisions under Section 820.2 of the California Government Code. As this argument was raised for the first time in Defendants' reply brief, the Court declines to reach it.

Captain Cota liable for negligence, the Court dismisses that claim as to Captain Cota and as to the City to the extent the claim is based on Captain Cota's conduct.

#### 4. Conclusion

For the reasons stated above, the Court GRANTS Defendants' Summary Judgment Motion as follows: 1) Claim Three (Failure to Intervene) and Claim Four (*Monell*) are dismissed in their entirety; 2) Claim Five (Bane Act), Claim Seven (Assault) and Claim Ten (Negligence) are dismissed as to Captain Cota and as to the City to the extent that vicarious liability is based on the conduct of Captain Cota. The Court DENIES Defendants' Summary Judgment Motion as to all remaining claims.

## III. *DAUBERT* MOTION

### A. Background

#### 1. Hassner Expert Report

In the Rule 26(a)(2)(B) Report of Dr. Ron E. Hassner ("Hassner Report"), Dr. Hassner describes himself as a "scholar of political violence, Middle East studies, and religion." Declaration of Emilyrose Johns in Support of Plaintiff's *Daubert* Motion ("Johns *Daubert* Decl."), Ex. C (Hassner Report) at 1. He holds a masters degree in International Affairs and a Ph.D. in political science and is currently a professor of political science at the University of California at Berkeley. *Id.* According to Dr. Hassner, he has "experience in providing reasonable interpretations of statements, messages, and symbols, and sentiments related to the Israeli-Palestinian context, its history and culture." *Id.*

Defendants provided Dr. Hassner with 91 photographs taken on March 2, 2024, that display graffiti "painted during" the Protest that day.[11] *Id,* Dr. Hassner, in turn, reviewed the photographs and classified the graffiti shown in them as "threatening graffiti, potentially threatening graffiti, and non-threatening graffiti." *Id.* at 2. He found that approximately one third of the photos depicted "threatening" graffiti, including graffiti proclaiming "Long Live Hamas";

[11] Dr. Hassner's statement that the graffiti was "painted during" the Protest is apparently based on what he was told by Defendants. His report does not cite any evidence that the graffiti was painted by participants in the Protest. Nor have Defendants offered the testimony of any witness who observed participants in the Protest painting the graffiti.

United States District Court
Northern District of California

graffiti showing "the inverted red triangle that Hamas uses to identify Israeli targets on the battlefield"; graffiti calling for "a death to Israel or a death to Zionism[,]" and "death to America"; and graffiti equating the Israeli Defense Force ("IDF") with the Ku Klux Klan ("KKK") and SFPD. *Id.* at 2-3.

Dr. Hassner found "potentially threatening graffiti" in 13 images. *Id.* at 3. This included graffiti with the words "From the River to the Sea[,]" "No More $$ 4 Genocide[,]" "Blood $$$[,]" "ISRAEL + MONEY = BLOOD[,]" "Stop the Holocaust on Gaza[,]" graffiti "call[ing] for, or prais[ing], 'Intifada' or 'resistance[,]' " and "Bring Home the Intifada." *Id.* at 4-6.

Dr. Hassner found 16 types of graffiti that contained messages he concluded were not threatening or promoting violence, including "Viva Gaza, Free Gaza, Save Gaza Kids, Save the Orphans, Gaza Must Live, Free Palestine, Palestina Libre, Viva Palestina, End the Occupation, Stand with Palestine, End this Genocide, Ceasefire Now, Israel Stop, Fuck Israel . . . [and] messages unrelated to the War in Gaza (such as 'Vote Socialist')." *Id.* at 6.

In support of his classifications, Dr. Hassner offers opinions about the political and historical context associated with many of the phrases. For example, in support of his opinion that "death to Israel" and "death to Zionism" are threatening messages, he opines:

> Zionism is the self determination movement of the Jewish people. It is a 150 year-old claim about the right of Jews for independence and self-rule. Zionists do not share a political stance about Israeli-Palestinian relations. Zionists include left-wing and right-wing individuals, hawks and doves, pro-war and anti-war individuals, religious and secular individuals, Jews, Christians, and Muslims. In 1948, Zionist efforts culminated in the creation of the State of Israel. A call to end Zionism is tantamount to a call to end the State of Israel. Naturally, these are threatening messages.

*Id.* at 3. He explains his conclusion that equating SFPD to the IDF is threatening as follows:

> The IDF is the Israeli military. This is a particularly striking threat to the SFPD because the police are not members of the armed forces. Members of the armed forces are legitimate targets in war. But the laws of war, as enshrined in the Fourth Geneva Convention, for example, protect civilian personnel, such as police, at times of war. The graffiti implies that the SFPD, like soldiers in a military, are legitimate targets of violence.

*Id.* at 3-4.

Dr. Hassner opines that "From the River to the Sea" is only "potentially threatening" for

the following reasons:

> This is part of a longer slogan, "From the River to the Sea, Palestine Will Be Free", which was adopted by the Palestine Liberation Organization (PLO) in the 1960s and later by Hamas. It is still widely used.
>
> "Will Be Free" could be meant as a call to liberate two Palestinian Territories that have been under Israeli occupation since the War of 1967, namely the West Bank and the Gaza Strip. 3.5 million Palestinians live in the West Bank and another 2 million live in Gaza. This part of the slogan could be interpreted as a vague hope for freedom for those 5.5 million Palestinians without proposing how that freedom should come about.
>
> However, the geographic space referenced in the statement includes not just those two Palestinian Territories but also all of sovereign Israel. It ranges "from the River" (Jordan) "to the (Mediterranean) Sea" and thus includes the entire territories disputed by Palestinians and Israelis. It includes not just 5.5 million Palestinians but also 10 million Israelis. The charter of the Palestine National Council (PNC) calls for "the recovery of the usurped homeland in its entirety." The PLO, and later Hamas, envisioned a Palestinian state that would "supersede" Israel.
>
> Opinions differ on whether this would involve expelling Israel's eight million residents, eliminating them, or merely subjugating them. It is clear that it would require terminating the current State of Israel. The Arabic version of the slogan, "From the Water to the Water, Palestine Will Be Arab" or even "From the Water to the Water, Palestine will be Muslim", suggests that "Free" is not merely a vague call for liberty but may demand concrete action to replace all Israelis or Jews who live "from the river to the sea" with non-Jews. That is not the only interpretation of the graffiti, but it is a reasonable interpretation with very threatening and violent implications to eliminate Jews, Israelis, and the State of Israel. Nearby graffiti calling for "Death to Israel" (see above) makes that threat explicit.

*Id.* at 4-5.

In his conclusion, Dr. Hassner opines that some of the graffiti messages "are 'dog whistles': they send a threatening message to those who understand their meaning while pretending to be innocuous for those who are less well versed in their cultural context." *Id.* at 7. He goes on to describe the principles that inform his conclusions as follows:

> Regardless of what the intentions of the protestors might or might not be, a reasonable observer would be justified in interpreting them as threats to do violence.
>
> The variety of non-threatening graffiti during this protest emphasizes the choice behind the more threatening messages. Protestors were familiar with non-threatening messages such as "Free Palestine" yet

> chose to also write "Long Live Hamas". They had come prepared with the red, white, black, and green spray paints necessary to draw a full Palestinian flag, but they also chose to draw the Hamas red triangle.[12] They could have drawn the line at "Fuck Israel" but chose to also write "Death to Israel".
>
> A final note on due caution in the face of potential violence. In academic circles, it is interesting to argue about which of the potentially threatening graffiti messages do or do not threaten violence. (I see no room for debate regarding the first or third categories). However, when real concerns about violence loom, it seems wise to adopt a wary interpretation of these borderline messages, let alone the very threatening messages in the first category. These messages did not take place in a vacuum. They were written by protestors marching towards the Israeli consulate and were intermingled with unambiguously threatening messages in support of terror and violence.

*Id.*

**2. The Motion**

In the Motion, Plaintiff contends Dr. Hassner's opinions should be excluded under Rule 702 of the Federal Rules of Evidence because: 1) his opinions are not supported by any "methodology by which one could evaluate the reliability of his principles and methods[;]" and 2) the opinions will not assist the trier of fact as the report discusses "wholly irrelevant graffiti" that neither Captain Cota nor Sergeant Caraway testified that they saw. *Id.* at 5-7. Plaintiff concedes that Dr. Hassner is "likely qualified, under the Federal standards, to opine on Middle East politics" and "even . . . to, within that context, speak to the history and use of certain phrases in the context of international conflict." Reply at 2-3. According to Plaintiff, "[w]hat [Dr. Hassner] is not qualified to do is offer opinions about which of those messages constitute threats, because he offers no methodology for doing so, and his opinions are not reliable." *Id.* at 3.

**B. Legal Standards under Rule 702 and *Daubert***

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

[12] Dr. Hassner does not point to any evidence in the record that any protestor was found to be in possession of spray paint of any color; nor have Defendants cited to any such evidence.



United States District Court
Northern District of California

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc*., in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)). The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met. *Id*. at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact

United States District Court
Northern District of California

to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id*. at 591. This is a question of "fit," and "is not always obvious." *Id.* The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*. To meet this requirement there must be "a valid scientific connection to the pertinent inquiry." *Id*. In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony " 'can be both powerful and quite misleading because of the difficulty in evaluating it.' " *Id*. (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). Therefore, federal judges should exclude scientific expert testimony under the second prong of the *Daubert* standard unless they are "convinced that it speaks clearly and directly to an issue in dispute in the case." *Id*. (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

"[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact should not be unduly prejudiced by testimony that is based on foreign concepts." *Volk v. United States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court described the district court's 'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony' survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002)).

**C. Discussion**

There is no dispute that Dr. Hassner is an expert in Middle East politics and is qualified to offer testimony about the political and historical context in which certain phrases and symbols depicted in graffiti found along the Protest route have been used. Nonetheless, Dr. Hassner's opinions fall short of the standards set forth in Rule 702 and *Daubert* for several reasons. First, his testimony will not assist the trier of fact. In particular, the key questions at trial will be: 1) whether a reasonable officer in Sergeant Caraway's position, under the same circumstances and

knowing what Sergeant Caraway knew, would have used the amount of force that Sergeant Caraway used against Plaintiff; and 2) whether Sergeant Caraway was substantially motivated by animus against the pro-Palestine message of the protesters. Both of those questions turn on the messages Sergeant Caraway was *aware* of when he used force against Plaintiff, but it is undisputed that Sergeant Caraway saw none of the graffiti that Dr. Hassner reviewed. Especially in light of the Court's dismissal of Plaintiff's claims against Captain Cota, who is the only defendant who testified to having seen *any* of the graffiti along the Protest route, the opinions in Dr. Hassner's report are too tangential to the issues of the case to meet the "fit" requirement of Rule 702 and *Daubert*. Furthermore, it is not clear that a lay person needs an expert to understand the significance of a phrase such as "death to Israel" or "death to America." Thus, many of Dr. Hassner's opinions invade the province of the jury as factfinder.

Second, Dr. Hassner has offered no reliable methodology in support of his assessment of the degree of "threat" embodied by different phrases he observed in the photographs he reviewed. Particularly troubling is his failure to explain how he has determined that the various phrases are indicative of the various threat levels he has described *in the context* of a political demonstration such as the one here. Defendants seek to offer Dr. Hassner's opinions to show that the protesters posed a threat to the safety of the officers and to individuals in the Israeli consulate (or that the officers reasonably believed that they did), yet Dr. Hassner has not pointed to any reliable methodology for drawing the conclusions that he did with respect to threat levels, such as correlating similar graffiti messages along march routes with actual violence or attacks on buildings associated with Israel at other pro-Palestine protests. Nor does Dr. Hassner's opinion that it "seems wise to adopt a wary interpretation of . . . borderline messages" offer a substitute for a reliable methodology. Therefore, the Court finds that Dr. Hassner's opinions concerning the degree of threat embodied by different phrases and symbols depicted in graffiti along the protest route do not meet the "scientific knowledge" requirement.

United States District Court
Northern District of California

Accordingly, the Court GRANTS Plaintiff's *Daubert* Motion and will exclude the opinions of Dr. Hassner at trial.

**IT IS SO ORDERED.**

Dated: October 12, 2026

JOSEPH C. SPERO
United States Magistrate Judge